**MICHAEL N. FEUER,** City Attorney
**SCOTT MARCUS**, Chief Assistant City Attorney (SBN 184980)
**CORY M. BRENTE**, Senior Assistant City Attorney (SBN 115453)
**SHANT TASLAKIAN**, Deputy City Attorney (SBN 272485)
**REBEKAH YOUNG**, Deputy City Attorney (SBN 214859)
200 North Main Street, 6th Floor, City Hall East
Los Angeles, California 90012
Phone: (213) 978-8722 / Fax: (213) 978-8785
Email: shant.taslakian@lacity.org

Attorneys for Defendants **CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT and ALVARO GARZON**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOEL GAUTIER, an individual; MATTHEW HORTON, an individual; and USA DIRECT WHOLESALE, INC., a private entity,<br><br>Plaintiffs,<br><br>vs.<br><br>LOS ANGELES POLICE DEPARTMENT, a municipal entity; CITY OF LOS ANGELES, a municipal entity; OFFICER ALVARO GARZON, an individual; and DOES 1 through 50, inclusive<br><br>Defendants. | CASE NO. CV20-08091 DMG(PDx)<br>*Hon. Judge Dolly M. Gee, Ctrm 8C, 1st Street*<br>*Mag. Judge Patricia Donahue, Ctrm 580, Roybal*<br><br>**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**<br><br>[Filed concurrently with Defendants' Notice of Motion and Motion for Summary Judgment; Declarations; Exhibits; and Proposed Judgment]<br><br>Date: October 14, 2022<br>Time: 9:30 a.m.<br>Court: 8C |

**TO THE HON. DOLLY M. GEE, UNITED STATES DISTRICT COURT JUDGE, AND TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1, Defendants CITY OF LOS ANGELES, LOS ANGLES POLICE DEPARTMENT, and OFFICER ALVARO GARZON ("Defendants") hereby submit their Separate Statement of Undisputed Material Facts and Conclusions of Law in support of the Motion for Summary Judgment.

## UNDISPUTED MATERIAL FACTS

| No. | Defendants' Undisputed Facts and Supporting Evidence | Plaintiffs' Disputed Facts and Supporting Evidence |
|---|---|---|
| 1 | **UF:** The percentage of delta-9 THC in marijuana cannot be determined by sight or smell or on-site field testing.<br><br>**Evidence:** Ceccia Depo at 21:23-25; 22:1; Holloman Depo at 21:3-7—Attached as Ex. 6 (Ceccia Depo) and Ex. 7 (Holloman Depo) to DCA Shant Taslakian declaration | |
| | **Defendants' Response:** | |
| 2 | **UF:** Even if delta-9 cannot be detected through plain view or smell, marijuana and hemp may still exhibit perceptible differences.<br><br>**Evidence:** Garzon Depo at 36:3-17—Attached as Ex. 5 to DCA Shant Taslakian declaration | |
| | **Defendants' Response:** | |
| 3 | **UF:** Hemp is not typically sold by retail cannabis stores. Stores that do carry hemp usually inform customers that a particular product is hemp and clearly mark it as such.<br><br>**Evidence:** Ceccia Depo at 23:13-19; Garzon Depo at 36:15-17—Attached as Ex. 6 (Ceccia Depo) and Ex. 5 (Garzon Depo) to DCA Shant Taslakian declaration | |
| | **Defendants' Response:** | |
| 4 | **UF:** Hemp-only stores usually do not have a security buzz door and there is usually signage that say hemp-only or CBD-only in front of the store or on the store's website. | |

| | | |
|---|---|---|
| | **Evidence:** Garzon Depo at 20:4-17; 49:23-25; 50:1-10—Attached as Ex. 5 to DCA Shant Taslakian declaration | |
| | **Defendants' Response:** | |
| 5 | **UF:** No such signage was present here and when executing the search warrants, no one at the store told Officer Garzon they were selling hemp rather than marijuana.<br><br>**Evidence:** Garzon Depo at 20:4-17; 21:19-24; 49:23-25; 50:1-10—Attached as Ex. 5 to DCA Shant Taslakian declaration | |
| | **Defendants' Response:** | |
| 6 | **UF:** During an undercover controlled buy at the store, Detective Oliver Malabuyo told the employee helping him: "I said that I needed some weed; I needed the good stuff. Something to that effect. And I specifically said, 'I don't want this CBD or hemp. I want the,' I guess you could say, 'good shit.'"<br><br>**Evidence:** Malabuyo Depo at 37:22-25-38:1-3 and Jan. 6, 2020 Search Warrant at 10—Attached as Ex. 10 (Malabuyo Depo) to DCA Shant Taslakian declaration and Ex. 2 (Jan. 6, 2020 Search Warrant) to Officer Alvaro Garzon declaration | |
| | **Defendants' Response:** | |
| 7 | **UF:** Lab testing is needed in order to determine the percentage of delta-9 THC present in any submitted sample<br><br>**Evidence:** Ceccia Depo at 23: 20-23; Holloman Depo at 19:17-20—Attached as Ex. 6 (Ceccia Depo) and Ex. 7 (Holloman Depo) to DCA Shant Taslakian declaration | |
| | **Defendants' Response:** | |

3

| | | |
|---|---|---|
| 8 | **UF:** . Samples submitted for testing revealed a delta-9 THC concentration of 0.45 percent (November 26, 2019 seizure) and 0.28 percent (January 6, 2020 seizure)<br><br>**Evidence:** Nov. 26, 2019 Lab Results at 2; Jan. 6, 2020 Lab Results at 2—Attached as Ex. 8 (Nov. 26 Results) and Ex. 9 (Jan. 6 Results) to Kareem Kassem Declaration | |
| | **Defendants' Response:** | |
| 9 | **UF:** The compound listed as "Δ9THC" in the lab results reflects the delta-9 THC concentration in the submitted samples. The "Total THC" level listed is comprised of the delta-9 THC and THCa percentages.<br><br>**Evidence:** Kassem Declaration at ¶ 8 | |
| | **Defendants' Response:** | |
| 10 | **UF:** The LAPD lab could not determine if a sample had less than .03 percent THC, which would make it legal hemp. Nor could it determine if a sample had between .03 percent and 1 percent THC, which would make it illegal marijuana. The detective who authorized the searches at issue here did not learn this until well after the January 6, 2020 search.<br><br>**Evidence:** Holloman Depo at 27:21-25; 28:2-11; Kiley Depo at 56:17-25—Attached as Ex. 7 (Holloman Depo) and Ex. 11 (Kiley Depo) to DCA Shant Taslakian declaration | |
| | **Defendants' Response:** | |
| 11 | **UF:** If police or prosecutors wanted testing below the 1 percent threshold, the LAPD lab would refer them to outside labs.<br><br>**Evidence:** Holloman Depo at 44:18-24; 45:20-25; 46:1-3—Attached as Ex. 7 to DCA Shant Taslakian declaration | |

| | | |
|---|---|---|
| | | **Defendants' Response:** |
| | 12 | **UF:** In November 2019, LAPD Detective Kiley learned that concerned citizens were complaining about an illegal cannabis business at 4501 W. Pico in Los Angeles (Blvck Label Cannabis). On November 4, 2019, Detective Kiley and LAPD Narcotics Officer Guerrero conducted surveillance at the store.<br><br>**Evidence:** Nov. 26, 2019 Search Warrant at 8-9—Attached as Ex. 1 to Officer Garzon Declaration |
| | | **Defendants' Response:** |
| | 13 | **UF:** In November 2019, Detective Kiley logged onto the Bureau of Cannabis Control website, which revealed that Blvck Label Cannabis was not on the list of authorized cannabis businesses in the State of California.<br><br>**Evidence:** Nov. 26, 2019 Search Warrant at 8-9—Attached as Ex. 1 to Officer Garzon Declaration |
| | | **Defendants' Response:** |
| | 14 | **UF:** Officer Garzon then conducted an internet search for "Blvck Label Cannabis" and found the store on Weedmaps. The website listed Blvck Label Cannabis as a cannabis business, open from 10:00 a.m. to 10:00 p.m., at 4501 W. Pico Blvd.<br><br>**Evidence:** Nov. 26, 2019 Search Warrant at 8-9—Attached as Ex. 1 to Officer Garzon Declaration |
| | | **Defendants' Response:** |
| | 15 | **UF:** On November 10, 2019, Officer Garzon conducted an undercover controlled buy at the store, purchasing $40 worth of |

| | | | |
|---|---|---|---|
| | | cannabis. On November 12, 2019, Garzon conducted another undercover controlled buy at the store and purchased $25 worth of cannabis. All items were booked into evidence.<br><br>**Evidence:** Nov. 26, 2019 Search Warrant at 9-10—Attached as Ex. 1 to Officer Garzon Declaration | |
| | | **Defendants' Response:** | |
| | 16 | **UF:** Based on their investigation and observations, the officers believed cannabis was being sold illegally at the store and that the business had not complied with state and city licensing requirements, all in violation of California Health and Safety Code §§ 11359, 11360 and 11366, as well as L.A.M.C. §104.15.<br><br>**Evidence:** Nov. 26, 2019 Search Warrant at 1—Attached as Ex. 1 to Officer Garzon Declaration | |
| | | **Defendants' Response:** | |
| | 17 | **UF:** Officer Garzon then drafted and sought approval for a search warrant for the store. On November 26, 2019, Judge Kevin S. Rosenberg reviewed and signed the warrant.<br><br>**Evidence:** Nov. 26, 2019 Search Warrant at 10— Attached as Ex. 1 to Officer Garzon Declaration | |
| | | **Defendants' Response:** | |
| | 18 | **UF:** The search warrant was executed on November 26, 2019. Officers arrested four individuals, including plaintiff Matthew Horton and seized 12 pounds of cannabis from the business.<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 10—Attached as Ex. 2 to Officer Garzon Declaration | |

| | | |
|---|---|---|
| | **Defendants' Response:** | |
| 19 | **UF:** On December 17, 2019, Detective Malabuyo confirmed that Blvck Cannabis did not have a license from the Department of Cannabis Regulation or Bureau of Cannabis Control.<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 10-11—Attached as Ex. 2 to Officer Garzon Declaration | |
| | **Defendants' Response:** | |
| 20 | **UF:** On December 17, 2019, Malabuyo entered the store's lobby and recognized an employee who was arrested on November 26, 2019, during the execution of the first search warrant, for violating Health and Safety Code § 11366. The employee buzzed Malabuyo past the front door.<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 10-11—Attached as Ex. 2 to Officer Garzon Declaration | |
| | **Defendants' Response:** | |
| 21 | **UF:** Malabuyo specifically asked the employee for some good "bud" (street vernacular term for green leafy cannabis) and not "hemp" or "CBD." The employee provided Malabuyo with "Caribbean Breeze Indica" and said it was some "good stuff."<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 10-11—Attached as Ex. 2 to Officer Garzon Declaration | |
| | **Defendants' Response:** | |
| 22 | **UF:** The employee opened the container and allowed Malabuyo to smell its contents. Malabuyo immediately detected the distinct odor of cannabis. Malabuyo agreed with the | |

7

| | | | |
|---|---|---|---|
| | | employee and said: "That's some good shit." He then purchased $25 worth of cannabis and left the store.<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 10-11—Attached as Ex. 2 to Officer Garzon Declaration | |
| | | **Defendants' Response:** | |
| | 23 | **UF:** On December 17, 2019, Officer Garzon confirmed that Blvck Cannabis was not licensed by the city Department of Cannabis Regulation or state Bureau of Cannabis Control.<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 11—Attached as Ex. 2 to Officer Garzon Declaration | |
| | | **Defendants' Response:** | |
| | 24 | **UF:** On December 20, 2019, Detective Malabuyo, while acting in an undercover capacity, conducted another controlled buy at the store. Malabuyo specifically asked the employee for some good "bud" and not "hemp" or "CBD."<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 11—Attached as Ex. 2 to Officer Garzon Declaration | |
| | | **Defendants' Response:** | |
| | 25 | **UF:** The employee provided "Blvck Label" and pointed to it inside the display case. She opened the clear container and allowed Malabuyo to smell its contents. Malabuyo then bought $22 worth of cannabis and left the store. The item was booked into evidence.<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 11—Attached as Ex. 2 to Officer Garzon Declaration | |

| | | | |
|---|---|---|---|
| | | **Defendants' Response:** | |
| | 26 | **UF:** Based on their investigation and observations, the officers believed cannabis was being sold illegally at the store and that the business had not complied with state and city licensing requirements, all in violation of Health and Safety Code §§ 11359, 11360 and 11366, as well as L.A.M.C. §104.15.<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 1-3, 12— Attached as Ex. 2 to Officer Garzon Declaration | |
| | | **Defendants' Response:** | |
| | 27 | **UF:** Officer Garzon then drafted and sought approval for a search warrant for the store. On January 6, 2020, Judge Rand S. Rubin reviewed and signed the warrant, which was executed later that day.<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 1-3, 12— Attached as Ex. 2 to Officer Garzon Declaration | |
| | | **Defendants' Response:** | |
| | 28 | **UF:** In addition to narcotics and cash, officers seized 9mm firearms and live ammo from the location.<br><br>**Evidence:** Jan. 6, 2020 Search Warrant at 1-3, 12— Attached as Ex. 2 to Officer Garzon Declaration | |
| | | **Defendants' Response:** | |

9

# CONCLUSIONS OF LAW

## Summary Judgment Standards

(1) A court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

(2) In ruling on a motion for summary judgment, the court must only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).

(3) The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

(4) The burden then shifts to the non-moving party to identify specific facts showing that there is a genuine issue of material fact. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 256 (1986).

(5) For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. A dispute is "genuine" only if the evidence is such that a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

(6) The court views the facts, and all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

(7) Summary judgment will thus be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

(8) Because a plaintiff bears the burden of proof at trial, a defendant may meet the summary judgment standard by pointing to the absence of evidence to support the plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**Delta-9 Overview**

(9) The Agriculture Improvement Act of 2018 (the Farm Bill or Act) legalized the possession and cultivation of hemp. See 21 U.S.C. § 802(16)(B) (noting that statutory definition of 'marijuana' no longer included hemp).

(10) Because marijuana and hemp are different varieties of the same plant, the Farm Act used the concentration of delta-9 THC to distinguish between the two substances. Delta-9 THC is the active parent ingredient of the psychoactive ingredient in marijuana. See *People v. Ray*, 2011 Cal.App.Unpub. LEXIS 181, at *3-4 (March 10, 2011).

(11) Hemp includes "any part of" the plant Cannabis sativa L. "and all derivatives, extracts, [and] cannabinoids … whether growing or not," with a delta-9 THC concentration of no more than 0.3 percent on a dry weight basis. See 7 U.S.C. § 1639o(1) (defining hemp); Cal. Health & Safety Code § 11018.5 (defining industrial hemp).

(12) The only statutory metric for distinguishing controlled marijuana from legal hemp is the delta-9 THC concentration level. *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 686, 690 (9th Cir. 2022).

(13) According to the DEA and FDA, "many cannabis-derived products do not contain the levels of cannabinoids that they claim to contain on their labels." *Id*. at 691 (citing Implementation of the Agriculture Improvement Act of 2018, 85 Fed. Reg. 51,639, 51,641 (Aug. 21, 2020).) Consequently, laboratory testing is needed in order to determine the percentage of delta-9 THC present in any submitted sample. See *id*.

**State and Local Regulations**

(14) In 2017, California enacted the Medicinal and Adult-Use Cannabis Regulation and Safety Act ("MAUCRSA"). *Wheeler v. Appellate Division of Superior Court*, 72 Cal.App.5th 824, 832 (2021).

(15) MAUCRSA imposes civil penalties for "unlicensed commercial cannabis activity," and provides that in addition to these civil penalties, "criminal penalties shall continue to apply to an unlicensed person engaging in commercial cannabis activity in violation of this division." Cal. Bus. & Prof. Code § 26038(c).

(16)   Los Angeles Municipal Code §§ 104.15(a)1 and (b)4 are part of a comprehensive scheme enacted in 2018 to regulate commercial cannabis activities in the city. *Wheeler v. Appellate Division of Superior Court*, 72 Cal.App.5th 824, 831 (2021).

(17)   The ordinance requires all businesses that manufacture, distribute, or sell medicinal and/or adult-use cannabis in the City to have a city-issued and prominently displayed license. *Wheeler v. Appellate Division of Superior Court*, 72 Cal.App.5th 824, 831 (2021). The ordinance imposes criminal penalties for establishing, operating, or participating in "any unlicensed Commercial Cannabis Activity in the City," which includes "renting, leasing to or otherwise allowing any unlicensed Commercial Cannabis Activity … to occupy or use any building or land." *Id.*. Violations are subject to nuisance abatement procedures and civil penalties up to $20,000. Violations are also punishable as misdemeanors by a fine up to $1,000 and up to six months in jail. *Id*. at 831-32.

(18)   California Health and Safety Code § 11366 provides that "[e]very person who opens or maintains any place for the purpose of unlawfully selling … any controlled substance … shall be punished by imprisonment in the county jail for a period of not more than one year or the state prison."

## The Warrants Were Based on Probable Cause

(19)   The question of whether a reasonable officer could have believed probable cause existed to justify a search or an arrest is an essentially legal question. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).

(20)   A warrant supported by probable cause compels dismissal of all Fourth Amendment claims based on the procurement and execution of that warrant. See *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (noting that presence of probable cause defeated all of plaintiff's claims); *Barry v. Fowler*, 902 F.2d 770, 772-73 (9th Cir. 1990) (upholding directed verdict dismissing plaintiff's Fourth Amendment claims because "a directed verdict is proper if no reasonable jury could determine that the officer did not have probable cause to arrest") (citation omitted); *Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006) (affirming summary judgment in favor of defendants and holding that because officers had probable cause to arrest plaintiff, plaintiff's false arrest and malicious

prosecution claims necessarily failed); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) ("To prevail on his section 1983 claim for false arrest … [the plaintiff] would have to demonstrate that there was no probable cause to arrest him").

(21) Where a search warrant is mandated, the reasonableness of search and seizure is measured in terms of whether probable cause exists. *Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 534 (1967). Probable cause requires a "'fair probability that contraband or evidence of a crime will be found in a particular place,' based on the totality of circumstances." *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

(22) According to California cases, probable cause is defined as "a fair probability that contraband or evidence of a crime will be found." *People v. Evans*, 200 Cal.App.4th 735, 753 (2011) (citations and internal quotation marks omitted).

(23) "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Illinois v. Gates*, 462 U.S. 213, 236 (1983). "A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Id.* (citation and internal quotation marks omitted).

(24) Officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. The fact that other inferences are possible does not mean that there is a triable issue of fact as to whether there was probable cause. *Hart v. Parks*, 450 F.3d 1059, 1067 (9th Cir. 2006).

(25) A misrepresentation based on an omission—as is alleged in this case—is material only where the omitted facts "cast doubt on the existence of probable cause." *Crowe v. County of San Diego*, 593 F.3d 841, 869-70 (9th Cir. 2010).

(26) To succeed on such a claim, a plaintiff must: (1) offer a "substantial showing" that the warrant affidavit contained a false statement or omission that was deliberately false or made with reckless disregard for the truth; and (2) establish that "without the dishonestly included or omitted information the affidavit is insufficient to establish probable cause." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1295 (9th Cir.1999).

**Officer Garzon is Entitled to Qualified Immunity**

(27) To determine if a government official is entitled to qualified immunity, courts must consider: (1) whether the official's conduct violated a constitutional right, and (2) whether that constitutional right was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.

(28) "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent … placed the statutory or constitutional question beyond debate." *City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015).

(29) The limited number of federal courts that have addressed whether lab testing is required before obtaining a search warrant have held that testing is *not* required before seeking or executing a warrant. See, e.g., *United States v. Hood*, 2017 U.S. Dist. LEXIS 127599, at *9 (E.D.Tenn. Aug. 11, 2017); *United States v. Shaw*, 2020 U.S. Dist. LEXIS 120293, at *20 (W.D.L.A. Feb. 21, 2020).

(30) In the context of a search with a warrant, qualified immunity is only lost where the warrant application is so lacking in an indicia of probable cause as to render official belief in its existence unreasonable. See *United States v. Leon*, 468 U.S. 897, 922-23 (1984); *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).

(31) An officer does not lose qualified immunity because of a mistaken, yet reasonable belief, nor do they lose immunity because of a reasonable mistake regarding the legality of their actions. *Saucier v. Katz*, 533 U.S. 194, 205-206 (2001).

(32) In short, "[s]ummary judgment is appropriate if there is *any* reasonable basis to conclude that probable cause existed." *Cross v. City of Des Moines*, 965 F.2d 629, 632 (8th Cir. 1992) (emphasis in original); see also *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004); *Gilles v. Davis*, 427 F.3d 197, 205 (3d Cir. 2005).

## The Municipal Liability Claims Must Fail

(33) Without an underlying constitutional violation, the City cannot be held vicariously liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). See, e.g., *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

(34) A *Monell* claim may be stated: (1) when official policies or established customs inflict a constitutional injury; (2) when omissions or failures to act amount to a local government policy of deliberate indifference to constitutional rights; or (3) when a local government official with final policymaking authority ratifies a subordinate's unconstitutional conduct. *Clouthier v . County of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010).

(35) A municipality's failure to train its police officers may be a basis for § 1983 liability if it amounts to deliberate indifference to the rights of persons with whom the police come in contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). However, a municipality's culpability "is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

DATED: Sept. 9, 2022    Respectfully submitted,

**MICHAEL N. FEUER,** City Attorney
**SCOTT MARCUS**, Chief Assistant City Attorney
**CORY M. BRENTE**, Senior Assistant City Attorney

By: */s/ Shant Taslakian*
**SHANT TASLAKIAN,** Deputy City Attorney

*Attorneys for Defendants* **CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT and ALVARO GARZON**